**WORLDCOM, INC., Appellant,**

v.

**FEDERAL COMMUNICATIONS
COMMISSION, Appellee.**

**Verizon New England Inc.,
et al., Intervenors.**

Nos. 01–1198, 01–1206 and 01–1209.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 9, 2002.

Decided Oct. 22, 2002.

Appeals of an Order of the Federal Communications Commission.

Mark D. Schneider argued the cause for appellants and intervenor AT&T Corp. With him on the briefs were Thomas F. O'Neil III, William Single IV, Karlen J. Reed, Assistant Attorney General, Attorney General's Office of Commonwealth of Massachusetts, Charles C. Hunter, Catherine M. Hannan, David W. Carpenter, Mark E. Haddad, and David L. Lawson. Mark C. Rosenblum and Peter D. Keisler entered appearances.

James M. Carr, Counsel, Federal Communications Commission, argued the cause for appellee. With him on the brief were John A. Rogovin, Deputy General Counsel, and John E. Ingle, Deputy Associate General Counsel.

Michael E. Glover argued the cause for intervenors Verizon New England Inc., et al. With him on the brief were Mark L. Evans, Donna M. Epps, Colin S. Stretch, and Scott H. Angstreich.

William P. Agee and Albert P. Halprin were on the brief for amicus curiae Massachusetts Department of Telecommunications and Technology, urging affirmance.

Before: TATEL and GARLAND, Circuit Judges, and WILLIAMS, Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge WILLIAMS.

STEPHEN F. WILLIAMS, Senior Circuit Judge:

On January 16, 2001 Verizon submitted an application to the Federal Communications Commission under § 271 of the Telecommunications Act of 1996, 47 U.S.C. § 271, seeking authority to offer long–distance service to customers in Massachusetts. The Commission approved the application on April 16, 2001, just within the statutory 90–day time limit. *In Re Application of Verizon, et al. for Authorization to Provide In–Region, InterLATA Services in Massachusetts,* 16 FCC Rcd 8988, 2001 WL 388287 (2001) ("Order"). WorldCom, AT&T and a number of similarly situated firms acting through a trade association ("appellants" or "WorldCom") challenge the approval. The parties' main dispute revolves around the Commission's conclusion that Verizon's rates for unbundled network elements ("UNEs") complied with the "TELRIC" standard (total-element long run incremental cost). Appellants' challenge in essence attacks as unreasonable the Commission's use in combination of two devices that it had employed separately, one in its § 271 approval for Oklahoma, which we upheld in *Sprint Comm. Co. v. FCC,* 274 F.3d 549 (D.C.Cir.2001), and the other in its § 271 approval for New York, which we upheld in *AT&T Corp. v. FCC,* 220 F.3d 607 (D.C.Cir. 2000). We are not persuaded. As for the two remaining issues, one requires a remand because the relevant record is not materially distinguishable from that in *Sprint;* we lack jurisdiction over the other.

\* \* \*

Because our opinions in *AT&T* and *Sprint* set out the statutory background in some detail, our treatment here will be brief. The decree settling the AT&T antitrust litigation, the Modification of Final Judgment ("MFJ"), see *United States v. American Telephone and Telegraph Co.,* 552 F.Supp. 131 (D.D.C.1982), *aff'd sub nom. Maryland v. United States,* 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983), split the sale of long-distance services from the sale of local telephone services, so that the Bell Operating Companies (spun off from AT&T by the MFJ) could provide local service but were barred from offering long-distance service in their local markets. But § 271 of the 1996 Act

allows those firms—now, together with their successors, commonly known as incumbent local exchange carriers or "ILECs"—to secure FCC approval to sell long-distance service to customers in the region for which they are the dominant local-service providers. To receive § 271 approval an ILEC must show (among many other things) compliance with a list of fourteen conditions, termed the "competitive checklist," designed to ensure that an ILEC will be permitted to sell long-distance service in its local region only when it has opened up the local service market to competition. 47 U.S.C. § 271(c)(2)(B).

One of the fourteen items on the checklist requires an ILEC to offer access to "network elements" needed by competitors to provide telecommunications service. See *id.* at § 251(c)(3) (incorporated into the competitive checklist by § 271(c)(2)(B)(ii)). These elements, the unbundled network elements or UNEs referred to earlier, must be offered to competitive local exchange carriers ("CLECs") at rates that are "establish[ed]" by state regulatory agencies pursuant to a "pricing methodology" prescribed by the FCC. See *AT&T Corp. v. Iowa Utilities Bd.*, 525 U.S. 366, 383, 119 S.Ct. 721, 732, 142 L.Ed.2d 835 (1999). The methodology chosen by the Commission is called TELRIC, which requires that rates be based on "the cost of operating a hypothetical network built with the most efficient technology available." *Id.* at 374 n. 3, 119 S.Ct. at 728 n. 3. See also *Verizon Communications, Inc. v. FCC*, 535 U.S. 467, 122 S.Ct. 1646, 152 L.Ed.2d 701 (2002) (upholding the TELRIC standard).

■ Application of the TELRIC standard has proved complex, involving detailed fact-finding over years of litigation in state agencies. This complexity has two important consequences for this case.

First, because the FCC has only 90 days to approve or reject a § 271 application, it cannot independently determine the TELRIC compliance of an ILEC's UNE rates. Rather, the FCC defers to the determinations of the state agencies who "possess[ ] a considerable degree of expertise" and who typically perform "a significant amount of background work" during the rate determinations. *AT&T*, 220 F.3d at 616. Thus, the FCC need only ensure that the state proceedings "comply with basic TELRIC principles" and are not infected with clear factual errors so "substantial that the end result falls outside of the range that the reasonable application of TELRIC principles would produce." *Id.* at 615–16. Second, the Commission may base its finding of TELRIC compliance on a comparison of the disputed rates with those of a neighboring state which it had already approved under § 271, provided that the applicant can demonstrate that local costs were at or above those in the benchmark state. See *Joint Application by SBC Communications, Inc. et al. for Provision of In–Region InterLATA Services in Kansas and Oklahoma*, 16 FCC Rcd 6237 (2001) at ¶ ¶ 82–87 (determining that the Oklahoma loop charges were TELRIC-compliant based on a comparison with previously approved Texas loop charges), *aff'd, Sprint*, 274 F.3d at 561.

The Massachusetts § 271 controversy began when Verizon filed an initial application in September 2000. Possibly because of various criticisms, including FCC concern over its UNE pricing, it withdrew the application in December. But before doing so it filed a tariff lowering its UNE rates to levels substantially equivalent to the rates offered by Bell Atlantic (Verizon's name before its merger with GTE) in New York, which had already secured Commission approval under § 271. See *AT&T*, 220 F.3d at 611–16.

These New York rates had themselves been the subject of challenge. CLECs had offered evidence—both before the New York Public Service Commission ("NYPSC") and the FCC (during the § 271 proceeding)—that Bell Atlantic had understated the size of the discounts it received on certain switch purchases, with the result that its UNE rates might in fact not comply with TELRIC. The NYPSC re-opened its proceedings to inquire into the claims, but the Commission nonetheless approved the § 271 application. In *AT&T* we rejected the CLECs' attack on the approval, finding that such newly discovered evidence was not in itself enough to upset an otherwise valid approval. 220 F.3d at 617–18. In a move loosely paralleling that of the NYPSC, the Massachusetts Department of Telecommunications and Energy ("DTE") in January 2002 embarked on its scheduled, quinquennial review of Verizon's UNE rates. Thus, as in New York, at the times the relevant § 271 applications were pending before the FCC, the disputed UNE rates were under challenge *and* review in the state agency with immediate authority.

WorldCom's leading claim is even if the New York rates were acceptable at the time, their age and their errors made them inadequate as benchmarks, so that the Massachusetts § 271 approval was arbitrary and capricious. In addition, they say that it was arbitrary and capricious for the FCC to dismiss their argument that the Massachusetts UNE rates created a "price squeeze," i.e., were so high that a CLEC could not use UNEs for profitable sale of local service. Finally, WorldCom argues that the § 271 application was fatally defective because, at the time it was filed, Verizon was not offering its advanced services at resale discounts, in contravention of item 14 on the competitive checklist, see § 271(c)(2)(B)(xiv).

### 1. *Reasonableness of the New York Benchmark*

■ WorldCom does not claim that there is anything inherently flawed in the Commission's use of benchmarking (which we upheld in *Sprint*), even where the previously approved rates had been seriously called into question, as was true of the rates approved in the New York § 271 process (which we upheld in *AT&T*). Rather, it contends that the Commission's deference under *AT&T* is owed to a process, not to a result; deference by the Commission is therefore inappropriate where the rates under review were adopted by a state agency (that of Massachusetts) that did not conduct its own fact-finding. Second, WorldCom argues that if the FCC chooses to use a benchmark to evaluate the UNE rates before it in the § 271 proceeding, it must ensure that the chosen benchmark is reasonable, based on all available evidence.

WorldCom's first point completely overlooks the facts of *Sprint*. There the ILEC had simply given a certain class of Oklahoma charges "an arbitrary 25% 'haircut,'" 274 F.3d at 558, which had the effect of bringing them into line with rates approved by the Commission for Texas, *id.* at 561. We see no principled distinction between Oklahoma's "process," accepting arbitrarily trimmed rates that matched ones approved in Texas (and blessed by the Commission under § 271) and Massachusetts's similar adoption of ones matching those approved in New York (and similarly blessed by the Commission).

Moreover, many of the elements of the "process" that merited deference under *AT&T* are present here, both in Massachusetts process itself and the Commission's clear recognition of the link between the ongoing New York proceedings and the Massachusetts rates. WorldCom points to

the critical role of the "active review and modification of Bell Atlantic's proposed [UNE] prices." *In re Application by Bell Atlantic New York to Provide In–Region, InterLATA Service,* 15 FCC Rcd 3953, at ¶ 238, 1999 WL 1243135 (2000),. But such active review is present here as well. The NYPSC is itself continuing to review its own UNE prices, and as the FCC stated in the Order, New York's rate revisions could "undermine Verizon's reliance on those [old] rates in Massachusetts and its compliance with the requirements of section 271," if the revisions were not also adopted in Massachusetts. 16 FCC Rcd 8988, at ¶ 30. In addition, the Commission noted that DTE itself was "endeavoring to reset UNE rates" and observed that if "prices are not set in accordance with our rules and the Act, [the Commission] retain[s] the ability ... to take appropriate enforcement action." *Id.* In light of these precautions, it was perfectly reasonable for the Commission to review the UNE rates in Massachusetts under the same deferential standard as it used in evaluating rates for New York and Oklahoma.

■ But WorldCom also argues that the Commission's chosen benchmark was unsuitable, having become radically detached from TELRIC. The causes of such detachment, according to WorldCom, range from the age of the rates (rates that passed muster in the December, 1999 § 271 proceeding for New York were more than a year older in April 2001), the flaws that had infected the rates from the beginning, and additional evidence brought to bear against them not present in the New York determination.

■ At some point, WorldCom's argument plainly must become a winner. In a market with falling costs, ancient UNE rates cannot serve as a valid benchmark. Nor could ones that had been convincingly shown, for example, to have been based on fraudulent ILEC submissions. Moreover, WorldCom is surely right to suggest that a challenger might tender evidence of benchmark unreasonableness so strong as to preclude FCC approval without a hearing.

■ To the extent, however, that WorldCom argues simply that the Commission could have chosen a better benchmark, it poses the wrong issue. The FCC need not choose the "optimal" benchmark, only a reasonable one. Nor can WorldCom expect the § 271 process to grow into a full-scale ratemaking on the part of the FCC, if for no other reason than the time constraints imposed by the 90–day limit. The FCC is thus under no duty to provide a detailed, point-by-point explanation of why it rejected the claim that use of the benchmark was improvident. Rather, the record need only show that the FCC reasonably concluded that it had, in light of appellants' claims and proffered evidence, reasonable grounds to be satisfied that the disputed rates were unlikely to exceed the range of TELRIC compliance. As we held in *AT&T,* 220 F.3d at 616, and reiterated in *Sprint,* 274 F.3d at 555, TELRIC is not a single rate but a ratemaking methodology that may yield a rather broad range of rates. We believe that here the Commission's review of the new evidence was enough.

■ WorldCom, for instance, points to comparative studies that show that other states have lower UNE rates than New York. But if TELRIC implies a range of rates—a point on which appellants themselves rely in pressing their price squeeze argument—then such variation by no means shows a lack of TELRIC compliance. WorldCom also provides an alternative cost study in support of their position, but this study was conducted in 1996, was rejected by DTE when presented to it in 1996, and does not appear to have ever

been accepted by the FCC. At best, this study proves that the Commission and appellants have different opinions on the best way to determine UNE prices; our deference, of course, is owed to the Commission.

Appellants also make much of the fact that the New York rates were the oldest UNE rates in the nation, and suggest that they were therefore outdated. In addition, they point to evidence of a decline in switch costs over time. While the New York rate may have exceeded theoretically perfect TELRIC levels when the Massachusetts Order was issued, such a lag does not render a rate invalid. Indeed, when element costs are falling, such temporary deviations, or regulatory lags, are both unavoidable and perhaps even desirable. In *AT&T* we recognized that a state's TELRIC rates could not always reflect the most recently available information, since rate determinations consume substantial periods of time and cannot be constantly undertaken. 220 F.3d at 617–18. Indeed, a process of Penelope-like unraveling and reinvention would, like hers, prove endless. And in upholding TELRIC, the Supreme Court affirmatively invoked the likelihood of a regulatory lag, saying that such a lag would prevent TELRIC prices from dropping so low as to unduly tempt CLECs to rely on ILEC-supplied UNEs rather than build their own facilities. *Verizon,* 535 U.S. at ———– ———–, 122 S.Ct. at 1669–70.

So the mere age of a rate doesn't render the FCC's reliance on it unreasonable; we can reverse the Commission's judgment only if it sufficiently disregarded the issue of the rate's age so as to adopt rates that were unreasonably outdated. This, we are satisfied, the Commission did not do. While it is true that the Commission made no explicit findings that the New York rates were in line with current costs, it adopted what is likely a far more workable approach to the problem of timeli-

ness—namely, reliance on the state's own processes of rate revision and correction. As noted above, the Commission observed that Verizon's § 271 compliance in Massachusetts would be undermined if its UNE rates fell out of line with TELRIC levels, as determined by the active rate review processes under way in New York and Massachusetts. 16 FCC Rcd 8988, at ¶¶ 29, 30, 33, 35. Unless these determinations were themselves unsupported or arbitrary and capricious—and we see no evidence that they are—nothing else is required of the Commission on this issue.

Apart from suggestions that the New York rates were no longer current, WorldCom points to additional flaws in the rates themselves. To a large extent these claims simply duplicate the assertions of inaccuracy that were at issue in *AT&T.* To that extent, obviously, appellants are simply inviting us to reject the conclusion we reached there—that the process of administrative correction under way in New York was enough to assure adequate TELRIC compliance for purposes of § 271—an invitation we could not accept even if we thought it wise (which we don't). In fact, it turns out here that in January 2002, *after* the Commission granted the Massachusetts § 271 approval, the NYPSC issued an order in large measure accepting the CLECs' position on the switch discounts, resolving several other issues in their favor, and requiring a reduction of the New York rates by more than 50%. See *Proceeding on Motion of the Commission to Examine New York Telephone Company's Rates for Unbundled Network Elements,* Order on Unbundled Network Element Rates, Case 98–C–1357 (N.Y.PSC Jan 28.2002). And the Massachusetts DTE followed suit with an order broadly accepting the CLECs' claims and in all likelihood leading to a comparable reduction. See *Investigation by the Department of Telecommunications and Energy*

*on its Own Motion in the Appropriate Pricing,* D.T.E. 01–20 (released July 11, 2002). These findings, obviously unavailable to the Commission at the time of its decision, seem more to establish the effectiveness of the process of agency correction on which it relied—rough though it may be—rather than a basic flaw in its approach.

WorldCom tries to distinguish our ruling in *AT&T* by noting that when *AT&T* was decided, the flaws at issue were thought to be small and difficult to recalculate, whereas they are now known to be large and easily recalculable. We note, however, that WorldCom has not even tried to take us through the math on this calculation; more tellingly, its claim relies on data collected by the Commission for the purposes of implementing its duties as to the Universal Service Fund—information that the FCC insists is unreliable for the determination of UNE rates. In *AT&T*, we held that this single errant cost input value did not justify a finding that basic TELRIC principles had been violated, and the proffer of additional evidence that is at best uncertain and highly contestable is not enough to justify a different conclusion.

█ More importantly, though, this attempted distinction misses the central point of our prior holding in *AT&T*: that it is reasonable for the FCC to rely on the states' periodic rate revision process as a means of correcting flaws in adopted rates. Indeed, if there now exists a database of switch purchases that provides greater accuracy for use in the TELRIC cost model, as WorldCom claims, it seems fair to assume that this new information was incorporated in the new rates promulgated by NYPSC and DTE, or will be if WorldCom seeks judicial review or invokes the FCC's own monitoring process under 47 U.S.C. § 271(d)(6). WorldCom may disagree with the wisdom of the strategy the Commission adopted here, and may be skeptical that the states' rate revision processes will keep their rates within the range of TELRIC compliance, but it hasn't demonstrated that the strategy is unreasonable.

WorldCom also notes that the New York rate revision procedure, unlike the one recently undertaken in Massachusetts, ordered refunds to correct for possibly incorrect cost inputs. But we didn't rely on the refund procedure in our decision in *AT&T*, and for good reason: state rate-setting procedures are complex systems aimed at balancing the competing interests of customers and investors, and we will not upset that balance *ad hoc* by requiring refunds (or requiring the Commission to do so) unless they are clearly necessary to render the rates TELRIC-compliant. Such was not the case in *AT&T*, and it is not the case here. As for the last attempt to distinguish *AT&T*—the claim that *retail* rates are so low in Massachusetts that these UNE rates would prove to be a greater entry barrier to CLECs than they did in New York—we note that this issue properly relates to WorldCom's price squeeze argument discussed below.

### 2. *Possible Price Squeeze and the Public Interest*

█ Appellants argue, as did their counterparts in *Sprint,* 274 F.3d at 554–56, that the FCC failed to consider their claim that the ILEC's UNE rates would create a "price squeeze," i.e., prices for CLECs' inputs so high as to largely disable them from competing profitably in the local market with the ILEC, the supplier of those inputs. See, e.g., *FPC v. Conway Corp.,* 426 U.S. 271, 96 S.Ct. 1999, 48 L.Ed.2d 626 (1976) (requiring agency to consider price-squeeze challenges to an electric utility's proposed wholesale rates). Indeed, the FCC's justifications for not considering this issue—briefly, that the "price-cost

squeeze" is irrelevant because § 271 directs the Commission only to examine costs rather than profits; that compliance with the competitive checklist is enough to prove that the market has been opened to competitive entry; that any deficiencies in actual local competition may well be due to individual ILEC strategies; and that the matter may turn largely on the level of purely local rates that are entirely under the authority of state regulators—are virtually identical to the rationales we found inadequate in *Sprint*. *Compare* Order, 16 FCC Rcd 8988, at ¶ ¶ 41, 234–35, *with Sprint*, 274 F.3d at 554–56. The rationales are no more convincing here than there.

The only apparent difference between the Order here and the Kansas/Oklahoma Order remanded in *Sprint* is that here the record indicates a higher volume of competitive entry. See Order, 15 FCC Rcd 8988, at ¶ 41 & n.112. But this evidence alone, unanalyzed, is not enough to discharge the Commission's duty to assure that ILEC entry to the long–distance market is in the public interest. After all, classic price squeeze cases have never turned on a finding that competition by the input-purchasing firms was *absolutely* precluded. See, e.g., *Anaheim v. FERC*, 941 F.2d 1234, 1238 (D.C.Cir. 1991) (describing price squeeze inquiry as determining whether the challenged conduct "has exerted *any* anticompetitive effects" (emphasis added)). Because of the range of TELRIC-compliant UNE rates, a set of fully compliant rates might—under some analyses and policy judgments, not addressed by the Commission in this record—impede local competition enough to render a § 271 approval in contravention of the "public interest." Accordingly, we remand the case for further consideration in the light of *Sprint*.

### 3. *Provision of Advanced Services at Wholesale Rates*

Appellants' final argument is that Verizon failed to satisfy checklist item No. 14, see § 271(c)(2)(B)(xiv), in that it was not, on the date of its application on January 16, 2001, offering CLECs DSL and other advanced services at wholesale rates. In so doing Verizon had relied on a justification that the Commission had formerly embraced, but that this court rejected in *Association of Communications Enterprises v. FCC*, 235 F.3d 662 (D.C.Cir.2001). That opinion was issued on January 9, 2001, but the mandate issued only on March 6, 2001. In reliance on this delay in the mandate, the Commission held that it would not consider Verizon's failure to provide the services at wholesale rates, saying that Verizon should not be faulted for complying "with a Commission order in effect at the time of the application." Order ¶ 219 & n.707.

It is undisputed that three days before the issuance of the Order here, Verizon (actually, its affiliate) had filed a tariff that brought it into full compliance with checklist item 14. At oral argument counsel for appellants admitted that the issue currently has no practical significance. Although the issue was discussed at oral argument in the context of possible mootness, it appears that nothing has happened between the initial filing of the suit and oral argument that might affect the significance of Verizon's delay. Thus we conclude that any Commission error *never* inflicted an injury sufficient to give WorldCom standing to bring the issue. WorldCom's half-hearted attempt to make out a theory that the issue was "capable of repetition, yet evading review" is therefore inapposite, as that familiar exception to mootness cannot confer standing on a claim when injury in fact was missing at the outset. *Friends of the*

*Earth, Inc. v. Laidlaw Envtl. Services,* 528 U.S. 167, 191, 120 S.Ct. 693, 709, 145 L.Ed.2d 610 (2000). In any case, the issue here does not even qualify as "evading review" since the issue is clearly capable of remedy if Verizon were to retract its resale discounts in this case, or were to withhold resale discounts in other states with respect to which it files a § 271 application. Thus, no matter whether the issue is a matter of standing, mootness or both, we are sure that the complete want of effect in the real world deprives us of jurisdiction over the intriguing question of how the distinction between opinion and mandate might play out in this context.

\* \* \*

We remand the price squeeze issue to the FCC for further consideration; we dismiss the checklist item 14 issue for want of jurisdiction; and in all other respects we affirm the Commission Order.

*So ordered.*