DIANE P. WOOD, Circuit Judge.
 

 While this case may not have dragged on as long as
 
 Jarndyce v. Jarndyce,
 
 it is not one of which the legal system can be proud. The immediate question before us is whether a woman whose lawyer embezzled funds from her back in 1967 and 1968 may, at long last, recover some portion of the monies due to her under a court judgment of April 11,1975. Not surprisingly, the embezzler also overlooked the tax payments he should have made, and so the United States is also before us hoping to satisfy (at least in part) certain tax deficiencies. The principal asset in question is a house in Wilmette, Illinois, where the embezzler, Melvin Levinson, and his wife, Muriel Levinson, lived until United States Magistrate Judge W. Thomas Rosemond, Jr. ordered them to vacate it on June 4, 1996. We conclude that the district court correctly decided that certain transactions purporting to assign Melvin’s interest in the property were ineffective to shield it from these creditors; we therefore affirm.
 

 
 *623
 
 I
 

 While some of the underlying facts were described in this court’s earlier opinion in
 
 Klingman v. Levinson,
 
 881 F.2d 1292 (7th Cir.1987)
 
 (Klingman
 
 I), most of the background relevant to this appeal was not rehearsed there. What follows is a brief summary of these complex proceedings, which the magistrate judge described in much more detail in his opinion. See
 
 Klingman v. Levinson,
 
 No. 80-C2305, slip op. (N.D.Ill. Sept. 15,1995)
 
 (Klingman II).
 

 A Land Trust No. 15398
 

 In 1960, Melvin and Muriel Levinson established an Illinois land trust, No. 15398, to be the title holder of their new home in Wilmette, Illinois. American National Bank and Trust Company of Chicago was, and remained at all pertinent times, the trustee, and Melvin and Muriel were the beneficial owners of the trust as joint tenants, each with a one-half interest. The Levinsons built their house for a total cost of $46,000. Of this amount, they paid $20,000 cash down (half of which was borrowed from Muriel’s mother, Sadye Blum) and they financed the rest with a 30-year mortgage from Fairfield Savings & Loan Association. They gave Mrs. Blum a signed certified note and letter promising to repay the $10,000 they borrowed from her.
 

 Melvin, a 1951 Harvard Law graduate, eventually proved to be less than a credit to his alma mater and his profession. On September 17, 1965, unbeknownst to Muriel, he assigned both of their interests in Trust No. 15398 to MLC Corporation in exchange for a loan of $15,600. In order to do so, Melvin forged Muriel’s name on the documents creating the assignment. Furthermore, the assignment was never filed with or made known to American National in spite of language in the land trust agreement specifying that “[n]o assignment of an interest shall be binding on the Trustee until the original or a duplicate is lodged with the Trustee and its acceptance indicated thereon.” Between 1964 and 1971, Melvin also allegedly borrowed an additional $10,000 to $11,000 from Mrs. Blum, again without Muriel’s knowledge.
 

 These relatively small amounts did not satisfy Melvin’s desire for ready cash, as his course of dealings with the unfortunate Francine Klingman demonstrated. In 1967, Melvin entered into a trust agreement with Klingman, a widow with two children who was one of his clients. Klingman gave Melvin $37,550 in bonds, which he was supposed to convert into cash and invest for her. Instead, he pocketed the money. Klingman discovered her loss in December 1968 and confronted Melvin in his office without result. On at least one occasion in the spring of 1969, Klingman spoke to Muriel about Melvin’s embezzlement of her money, telling her the whole story in detail, imploring her to help, and warning that she (Klingman) was prepared to litigate if necessary. These efforts were similarly unavailing, and Klingman filed suit against Melvin in March 1970 for misappropriating her trust’s assets.
 

 Somewhere around 1971, Melvin, as he put it “walked away from life.” (Not too long afterwards, in 1972, he was disbarred,. convicted for contempt of court, and served at least part of a five-year prison sentence. See
 
 Klingman v. Levinson,
 
 158 B.R. 109, 111 (N.D.Ill.1993);
 
 People v. Levinson,
 
 75 111. App.3d 429, 31 Ill.Dec. 307, 311, 394 N.E.2d 509, 513 (1979);
 
 In re Levinson,
 
 No. 43560 (Ill. Sept. 26, 1973).) The district court found that Melvin had been insolvent since 1970 and at all times thereafter through the date of the trial. This left Muriel, who took care of household bills and family life, in a bad spot.
 

 By August 1972, the MLC loan was $1,223 in arrears and MLC was threatening to foreclose its interest in the trust. The mortgage on the house was about $2,555 in arrears, and on August 11, 1972, Fairfield Savings threatened to foreclose if the account was not brought up to date by the end of the month. In this dire moment, Mrs. Blum came to her daughter’s rescue. On September 6, 1972, she personally paid in full the balance of the MLC loan, which caused MLC to reassign to Melvin and Muriel the beneficial interest in Trust 15398. Mrs. Blum also brought the mortgage payments current to September 1972. In exchange for this beneficence, Mrs. Blum wanted Melvin to assign his beneficial
 
 *624
 
 interest in the trust to Muriel. She saw it as “buying from him the house for my daughter,” as she later testified. On September 11, 1972, Melvin accordingly completed an assignment form that purported to transfer all of his beneficial interest in the trust to Muriel. The form contained the following language, which mirrored the language in the trust agreement noted above: “This assignment shall not be binding on the Trustee unless and until the original or a duplicate thereof is lodged with the Trustee and its acceptance indicated thereon.” Muriel gave the assignment to her brother, Selwyn Blum, who did
 
 not
 
 forward it to the Trustee, but who instead kept it in his office for more than four years (until January 1977).
 

 B. Tax Troubles
 

 As if the ordinary debts were not enough, Melvin managed to get the family in tax trouble as well. In May 1970, the Internal Revenue Service served a levy on Melvin and Muriel for unpaid taxes in 1960 and 1968, claiming that they owed $11,118.56 for those two years. On June 25, 1970, it served another levy on them, apparently amending the first one, covering tax years 1960,1961,1962, and 1963, claiming that $23,289.12 was due. Melvin responded by signing Form 433AB, a Statement of Insolvency, in which he swore under penalty of perjury that he was insolvent. The IRS followed up with a February 10, 1971 levy against Trust 15398 and a notice of that levy to both the Trustee and to the Levinsons. The Trustee forwarded a copy of the notice to MLC Corp., which it somehow knew held the beneficial interest in the trust. A February 1973 audit of Melvin and Muriel’s joint 1969 tax return revealed a deficiency related to unreported embezzlement income, which predictably led in June 1973 to a notice of deficiency. On October 18, 1973, the IRS assessed the 1969 tax liability. It also discovered unreported embezzled income for 1966 through 1968 but did not assess those liabilities until December 5, 1978.
 

 Because she had jointly signed and filed the 1966 through 1969 tax returns with Melvin, Muriel was jointly liable for his tax liabilities for those years. In 1977, however, she obtained an “innocent spouse” exemption from the liability when she submitted an affidavit, dated February 7, 1977, swearing under oath that she did not discuss or participate in Melvin’s business activities, bookkeeping, and tax return preparation and that she had no reason to know of any omission of income from Melvin’s returns for the years in question. At paragraph 8 of her affidavit, Muriel specifically stated that
 

 [s]he did not ... receive any unusual or extraordinary support or transfers of property, either real or personal, from Melvin Levinson or anyone acting on his behalf during the years at issue and subsequent thereto.
 

 In 1978, Melvin agreed to pay the IRS a total of $119,655.50 for the tax years 1966 to 1969.
 

 C. Klingman’s Collection Action
 

 Klingman’s 1970 suit against Melvin resulted in an April 11, 1975, Agreed Judgment Order in her favor for $62,100, representing her original $37,550 investment plus $10,000 in attorney’s fees and interest. In connection with the Order, Melvin stipulated that his debt to Klingman would not be discharge-able in any bankruptcy or similar proceeding.
 

 Melvin’s promises did not prove to be too valuable. Klingman returned to Illinois Circuit Court in 1976 with a supplementary action to collect her settlement. In this action, she discovered the existence of Trust 15398. She attempted to satisfy her judgment by foreclosing on Melvin’s beneficial interest in the trust and forcing a sale of the Levinsons’ home, but Muriel intervened in the case in 1977 and claimed that Melvin had no remaining interest in the trust. Muriel relied on the purported September 6, 1972 assignment, which was delivered to the Trustee only on January 19, 1977 and has (still) never been accepted by the Trustee. When she learned about the assignment to Muriel, Klingman tried to have it set aside as a fraudulent conveyance.
 

 In 1980, the United States intervened in Klingman’s still-pending collection action and removed it to the federal district court. The government argued in the alternative that either (1) if Melvin’s assignment took place in 1977, the IRS tax lien on his interest was
 
 *625
 
 superior to Klingman’s judgment lien, or (2) if Melvin’s interest was assigned in 1972, the conveyance was fraudulent.
 

 D. The Bankruptcy and District Court Proceedings
 

 On April 22,1982, Melvin filed a bankruptcy petition under Chapter 7. This initially had the effect of staying the collection action, and in May 1982, Melvin removed Klingman’s collection action from the district court to the bankruptcy court. The bankruptcy court discharged Melvin in 1985 and later confirmed that the Klingman judgment debt was not dischargeable. See
 
 In re Levinson,
 
 58 B.R. 881 (Bankr.N.D.Ill.), aff'd.
 
 sub nom. Klingman v. Levinson,
 
 66 B.R. 548 (N.D.Ill. 1986), aff'd, 831 F.2d 1292 (7th Cir.1987).
 

 This left the collection action in the bankruptcy court, but on November 1, 1985, the district court withdrew its reference of the collection action to the bankruptcy court and restored the case to its docket. Upon their return, the parties consented to have the case tried before a magistrate judge. Melvin then moved to dismiss the United States from the collection action. The United States understandably opposed that effort, but it joined Melvin in requesting the court to abstain from reaching the merits of the collection action until the bankruptcy court resolved the ongoing dispute about the dischargeability of the United States tax liens. (Melvin would continue to litigate the nondisehargeability of the tax liens and Klingman’s agreed judgment through at least November 16, 1992. See
 
 Klingman v. Levinson,
 
 877 F.2d 1357 (7th Cir.1989) (challenging Klingman judgment);
 
 Levinson v. United States,
 
 969 F.2d 260, 261 (7th Cir.),
 
 cert. denied,
 
 506 U.S. 989, 113 S.Ct. 505, 121 L.Ed.2d 441 (1992) (challenging IRS judgment).)
 

 The collection action got back on track in late 1990, after it appeared that the bankruptcy court’s ruling that the government’s tax liens were nondischargeable would become final. See
 
 Levinson v. United States (In re Levinson),
 
 Adv. No. 85-A1432, Bankr.82-B-5309 (Bankr.N.D.Ill. Apr. 18, 1990). Melvin and Muriel moved for summary judgment, which was denied on August 17, 1993. More than two years later, on September 15, 1995, after a four-day bench trial, Magistrate Judge W. Thomas Rosemond ruled that the 1972 assignment from Melvin to Muriel was fraudulent in fact, fraudulent in law, and ineffective as a matter of law. The court ordered judgment of foreclosure for Klingman against Melvin and his beneficial interest in the trust for the $62,100 awarded in 1975 plus accrued interest and attorneys’ fees — an amount by then equaling approximately $309,300 in 1995 dollars. It also ordered judgment of foreclosure against Melvin in favor of the United States for the tax deficiencies related to the years 1966, 1967, 1968, 1969, 1973, 1975, 1977, and 1978. Finally, it directed that the Wilmette house be sold. Half the proceeds were to go to Muriel, and the other half was to be used first to satisfy Klingman’s judgment and then, if anything remained, to pay the taxes.
 

 On September 29, 1995, Muriel filed motions for a new trial and to amend the judgment, and the United States filed an objection to the portion of the judgment that gave Klingman’s claim priority over the government’s. The district court initially denied both parties’ motions, but on October 31, in response to the government’s motion to reconsider, it modified the judgment to provide that Klingman had priority over the government only for the first $50,000 of her half of the proceeds. This appeal followed, in which Klingman has adopted the United States’ appellate brief.
 

 n
 

 Although the poundage of the materials filed on appeal is considerable, the case turns on one question: did Melvin effectively divest himself of his interest in the land trust through the 1972 assignment, or was it ineffective or invalid? The United States and Klingman offer three reasons why the assignment should be disregarded: (1) it was ineffective from the beginning as against a third party like Klingman or the government, because it did not comply with the formalities required in the agreement; (2) it was fraudulent in fact; and (3) it was fraudulent in law. The district court concluded that all three of these theories were supported by the evidence. In order to sustain its judgment, our
 
 *626
 
 agreement on any one would be sufficient. Because we find that the district court did not clearly err in concluding that the assignment was fraudulent in fact and that it was in any event ineffective according to its own terms, we do not address the question whether it was also fraudulent in law.
 

 The governing Illinois law on the question of fraudulent assignments was, at the times pertinent to this case, the now-repealed Ill.Rev.Stat. Ch. 59, para. 4:
 

 Every gift, grant, conveyance, assignment or transfer of ... any estate, real or personal, ... made with the intent to disturb, delay, hinder or defraud creditors or other persons ... shall be void as against such creditors, purchasers and other persons.
 

 740 Ill.Comp.Stat. § 80/4 (repealed 1990). The Illinois Appellate Court recently explained the difference between the two types of fraud in
 
 Casey National Bank v. Roan,
 
 282 Ill.App.3d 55, 218 Ill.Dee. 124, 668 N.E.2d 608, appeal denied, 169 Ill.2d 564, 221 Ill.Dec. 436, 675 N.E.2d 631 (1996):
 

 Illinois courts have divided fraudulent conveyance cases into the categories of fraud in fact and fraud in law. Proof of fraud in fact requires a showing of an actual intent to hinder creditors, while fraud in law presumes a fraudulent intent when a voluntary transfer is made for no or inadequate consideration and directly impairs the rights of creditors____ Fraud in law requires proof of (1) a voluntary transfer for inadequate consideration, (2) an existing indebtedness against the donor, and (3) retention by the donor of insufficient property to satisfy the indebtedness.
 

 668 N.E.2d at 611, 218 Ill.Dec. at 127 (citations omitted). In examining the “actual intent to hinder creditors,” the conduct of both the grantor and the grantee is relevant. As the court explained in
 
 Reagan v. Baird,
 
 140 Ill.App.3d 58, 94 Ill.Dec. 151, 487 N.E.2d 1028 (1986), “[i]n order to establish the fraudulent nature of a conveyance supported by consideration, it is necessary to establish actual fraud on the part of the debtor and participation in the fraud by the grantee.”
 
 Id.
 
 at 1034, 94 Ill.Dec. at 157. See also
 
 Ziegler v. Obernuefemann,
 
 323 Ill.App. 317, 55 N.E.2d 539, 541 (1944) (setting aside debt-or’s transfer of farm to children in exchange for “unpaid wages”).
 

 Although the question whether the 1972 assignment was supported by consideration is technically important, since a conveyance without consideration would be fraudulent in law (if the other requirements were also present), we find it unnecessary to resolve here. We assume for the sake of argument that Melvin’s assignment of his interest to Muriel was paid for, in essence, by Mrs. Blum’s payments of the remaining balance on the MLC loan, the mortgage arrearage, and her forgiveness of Melvin’s portion of the 1960 loan. (We note that the district court found otherwise, concluding that the MLC and mortgage payments were gifts and that Mrs. Blum never intended to forgive any part of the 1960 loan; we express no opinion on the correctness of these conclusions.) On that assumption, the question is whether Melvin intended to defraud creditors when he made the 1972 assignment, and whether Muriel participated in that fraud. These are questions of fact, for which the “clearly erroneous” standard of review applies.
 

 As the district court found, for purposes of the fraudulent conveyance action, Klingman became a creditor when her claim arose in 1969, even though it was not reduced to judgment until April 11,1975. See
 
 Klingman II
 
 at 30. Melvin obviously knew this, because he testified that in making the 1972 assignment he “intended to prefer [his] wife’s parents in their debt, even if it meant that it excluded Klingman and the government.”
 
 Id.
 
 at 33-34. The district court specifically rejected his testimony on intent, finding instead that “Melvin Levinson transferred his beneficial interest to his wife to keep the family home out of the hands of creditors in general, and plaintiff Franeine Klingman and the Government in particular.”
 
 Id.
 
 The district court pointed to the fact that the Levinsons kept the 1972 transfer a secret until 1977 as further evidence that Melvin was intentionally trying to hinder his creditors from collecting what was due to them.
 

 Furthermore, the district court found that Muriel was aware of the tainted nature of the 1972 assignment and participated in its con
 
 *627
 
 cealment. Most importantly, she did not divulge it when she signed the “innocent spouse” affidavit filed with the IRS in 1977, even though she was asked to disclose “any unusual or extraordinary support or transfers of property, either real or personal, from Melvin Levinson ... during the years at issue and subsequent thereto.” Muriel now argues that because she believed the affidavit only applied to gifts, and not to the transfer of the beneficial interest, the district court could not have found that she had an intent to deceive. The district court, however, did not accept her argument; it was influenced instead by the fact that Muriel had been handling the family finances since the late 1960s (due to Melvin’s escalating problems), that she knew all about the Klingman debt from Klingman herself well before 1972, that she had a strong incentive to save her family home, and that Muriel never paid trust administrative fees or attempted to set up a billing arrangement. We find that the district court did not clearly err in finding that both Melvin and Muriel intended to protect the Wilmette property from Melvin’s creditors when they executed the assignment.
 

 Taking another approach, Muriel also argues that Klingman and the United States should be estopped from arguing that the assignment was fraudulent in fact, because the bankruptcy court found that the IRS had not proven that the 1972 assignment was “a willful effort by the debtor to evade or defeat the payment of taxes,” and it therefore found that the income taxes and interest and penalties for years other than 1966 through 1969 were dischargeable. The district court rejected this because the bankruptcy court applied a “clear and convincing” evidence standard, while it thought that only a preponderance standard applied in the present action, and because the parties had stipulated that the tax adversary proceeding would have no collateral estoppel effect.
 

 Whether or not there is any difference between the standard of proof for proving fraud for purposes of the bankruptcy rule that prevents dischargeability if a debtor attempts to hide a tax liability through fraud or deceit and the standard in a fraudulent conveyance dispute, the bankruptcy court itself made it clear that it was not rendering a final decision on the issue before us:
 

 [I]t is important to note that the court does not now have before it the question of whether the conveyance of the beneficial interest in the land trust to the debtor’s wife should be set aside. That question is currently pending before the district court in a Separate proceeding in which the IRS and Klingman assert the conveyance should be set aside for their respective benefit.
 

 Klingman v. Levinson,
 
 158 B.R. at 109. Nothing in this passage suggests that the bankruptcy court was issuing a final decision on the fraud in fact theory, as opposed to fraud in law, despite Muriel’s efforts so to characterize it.
 

 In addition, issue preclusion is a defense that can be waived by a party, see
 
 Kratville v. Runyon,
 
 90 F.3d 195, 198 (7th Cir.1996);
 
 Garry v. Geils,
 
 82 F.3d 1362, 1367 n. 8 (7th Cir.1996), and the stipulation in the bankruptcy proceeding effectively waived any preclusion defense Melvin may have had against the government if it sought to relitigate this issue. Muriel, who was not a party to the bankruptcy, may not be bound by the stipulation (assuming that for this purpose she is not in privity with Melvin), but neither is she automatically entitled to invoke non-mutual issue preclusion against the government, especially since she did not raise the claim in her trial brief. Klingman was also not part of the bankruptcy proceeding, and there is no basis at all for finding that her effort to set aside the 1972 assignment should be affected by what went on between Melvin and the government. Under the circumstances, we conclude that neither Muriel nor Klingman is either bound or benefitted by the result of the bankruptcy proceeding, and thus that the district court was free to consider the question of fraud in fact with respect to both of them
 
 de novo.
 

 Even if, contrary to our conclusion, the bankruptcy court’s finding that the government had failed to prove that the assignment was fraudulent supported Muriel’s position here, we would still affirm the decision of the court below on the alternative ground that the 1972 assignment was not perfected in a
 
 *628
 
 way that would be binding against third parties like Klingman and the government. The Levinsons — united for this purpose — argue that the district court should never even have considered the legality of the assignment, because they claim it was considered and adjudicated in their favor in 1979 in the Circuit Court of Cook County (before the action was removed to federal court). On December 18, 1978, Muriel moved in the Circuit Court for summary judgment to resolve the legal effect of the failure to lodge the assignment. After denying the motion, Circuit Judge Cohen signed a July 17, 1979 amendment (drafted by Muriel’s lawyer) to the original order stating that:
 

 4. The order entered by this Court on March 6,1979 denying summary judgment is amended to the extent that it is decreed by this Court that the assignment of beneficial interest in American National Bank trust # 15398 from Melvin E. Levinson to Muriel B. Levinson dated September 11, 1972 is not invalid because of the fact that said assignment was not accepted by the trustee.
 

 Neither Klingman nor the United States ever sought reconsideration of this ruling before Cook County court or the district court; Muriel now argues that this means that the district court was bound by the law of the case not to reconsider this ruling.
 

 There are several problems with this theory. First, the determination that the failure to lodge the assignment with the trustee did not itself render the assignment invalid was not necessary to Judge Cohen’s decision and is thus dicta at most. Second, Muriel did not raise a law of the case argument in her trial brief, which means that she cannot raise it for the first time on appeal. The issue of the effectiveness of the assignment has been preserved throughout this litigation; indeed, it was one of the three grounds on which the district court expressly relied. Whatever the seriatim trial courts to hear this case may have decided, this appeal is the first opportunity the parties have had to test the correctness of either Judge Cohen’s conclusion or Magistrate Judge Rosemond’s contrary conclusion. Muriel argues weakly that the parties might have asked for an interlocutory appeal under 28 U.S.C. § 1292(b) on this point, but such appeals are discretionary, reserved for only the most important questions, and are emphatically not a prerequisite to raising something in a proper appeal from a final judgment. We therefore consider ourselves free to decide whether this theory supports the judgment of the district court.
 

 Beneficial interests in Illinois land trusts are considered interests in personal property and are governed by the Illinois Uniform Commercial Code. See
 
 Chrysler Credit Corp. v. Louis Joliet Bank and Trust Co.,
 
 863 F.2d 534, 536 n. 2 (7th Cir. 1988);
 
 Kramer v. Exchange Nat’l Bank of Chicago,
 
 118 Ill.2d 277, 113 Ill.Dec. 248, 249-250, 515 N.E.2d 57, 58-59 (1987);
 
 Wambach v. Randall,
 
 484 F.2d 572, 575 (7th Cir.1973). In order to be binding against third parties, an assignment must be perfected in accordance with any explicit agreement between the parties. See 810 Ill.Comp.Stat. 5/9-302 (West 1996);
 
 FDIC v. Wooten,
 
 80 B.R. 917, 919 (N.D.Ill.1987). Therefore, under Illinois law, if a trust agreement expressly and on its face requires an assignment of a beneficial interest in the land trust to be lodged with and accepted by the trustee, the assignment is not effective until these steps have been completed. See,
 
 e.g., St. Charles Sav. & Loan Ass’n v. Estate of Sundberg,
 
 150 111. App.3d 100, 103 Ill.Dec. 301, 306, 501 N.E.2d 322, 327 (1986);
 
 Larkin v. Bank of Ravenswood,
 
 91 Ill.App.3d 803, 47 Ill.Dec. 290, 291, 415 N.E.2d 15, 16 (1980). Here, it is undisputed that the terms contained in the trust agreement were never satisfied: American did not learn of the assignment until 1977, some five years after it occurred, and American has never accepted it. For this independent reason, therefore, the assignment was ineffective under Illinois law to defeat the interests of third parties like Klingman and the government.
 

 Ill
 

 Melvin Levinson, while adopting Muriel’s arguments against the judgment of the district court, also claims that the “judgment against defendant was rendered as a sanction pursuant to Rule 11, Fed.R.Civ.Pro., ... because the defendant moved to impose
 
 *629
 
 sanctions against plaintiffs counsel.” Besides claiming that nothing he did violated Rule 11 (and continuing to attack plaintiffs lawyer’s conduct), he also argues that he did not have the economic resources to pay the “sanction” imposed by the court. Finally, he raises several arguments all to the effect that the bankruptcy petition and its outcome prevent the relief the government and Klingman seek here. Neither of these points has any merit. It is frivolous to argue that the judgment itself of the district court constituted a Rule 11 sanction or that it was imposed merely to punish Melvin for other motions he may have filed. Since the judgment was not a “sanction,” Melvin’s resources (or lack thereof) are irrelevant. The filing of the bankruptcy petition did nothing to pretermit the fraudulent conveyance action; although it had the temporary effect of staying that action, the bankruptcy court remanded the conveyance action to the district court because it was a non-core proceeding. For the reasons noted above, the bankruptcy court’s findings did not preclude the government from litigating the issue here whether the assignment was a fraudulent conveyance, nor did the bankruptcy court proceedings preclude the government from reducing its claim to a monetary judgment.
 

 We hope, after all this time, that this case can now draw to a close. The judgment of the district court is Affirmed.