WISCONSIN BELL, INC., d/b/a SBC Wisconsin, Plaintiff,

v.

Burneatta BRIDGE, Ave M. Bie and Robert M. Garvin, in Their Capacity as Commissioners of the Public Service Commission of Wisconsin and Not as Individuals, Defendants,

and

AT & T Communications Of Wisconsin, L.P., TDS Metrocom, LLC and Worldcom, Inc., d/b/a MCI, Intervening Defendants.

No. 03–C–430–C.

United States District Court, W.D. Wisconsin.

Aug. 26, 2004.

Diane M. Ramthun, Niles Berman, Wheeler, Van Sickle & Anderson, S.C., Madison, WI, for Defendants.

## OPINION AND ORDER

CRABB, District Judge.

This is a civil action brought by plaintiff SBC Wisconsin pursuant to 47 U.S.C. § 252(e)(6) and 28 U.S.C. § 1331 to obtain judicial review of several determinations made by defendant commissioners of the Public Service Commission of Wisconsin concerning those portions of plaintiff's network that plaintiff must make available to the intervening defendants and at what cost. (Before the enactment of the Telecommunications Act of 1996, plaintiff held a monopoly in Wisconsin; now it is obligated to provide its competitors with access to its network for a reasonable fee. 47 U.S.C. § 251(c)(3); *Verizon Maryland,*

*Inc. v. Public Service Commission of Maryland,* 535 U.S. 635, 638, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002)).

Under the Act, an incumbent can agree with its competitors on the network elements it will make available to them and the price it will charge for those elements. 47 U.S.C. § 252(a). In this case, however, the parties did not reach agreement. Instead, the Public Service Commission initiated an investigation to make the determinations for the parties. *See* 47 U.S.C. § 252(b). The commission issued two opinions as a result of its investigation, or "arbitration" as the process is called in § 252. *See Final Decision,* Docket No. 6720–TI–160 (March 22, 2002); *UNE [Unbundled Network Elements] Compliance Order,* Docket No. 6720–TI–160 (July 9, 2003). In the *Final Decision* at 1, the commission considered "[w]hat [unbundled network elements] [plaintiff] must offer and how those [elements] should be priced." However, the commission did not actually set the prices in the decision, but only "determine[d] the details of a methodology that can be used to determine cost base prices." *Id.* In addition, it ordered both plaintiff and intervening defendants to rerun their cost studies in accordance with the decision.

In the *UNE Compliance Order,* at 8, the commission "specifie[d] how cost studies should be modified to comply with the Commission's *Final Decision.*" Although the commission set many interim rates, it determined that "further process will be necessary for certain issues to determine the rates that result from the Commission's selected methodologies." Among other things, the commission delegated three issues to the Telecommunications Division Administrator: (1) the discount to which intervening defendants were entitled for DLC electronics; (2) the amount of operating support system testing costs that should be included in the "joint and common costs"; and (3) the amount of the integrated digital loop carrier conversion costs.

Plaintiff challenges many of these determinations; the intervening defendants sought intervention to defend the determinations and to raise challenges of their own. In addition, intervening defendant TDS Metrocom, LLC, seeks a remand of the proceedings to the commission because, it contends, it did not receive the procedural protections it is guaranteed under the Telecommunications Act and the due process clause of the Constitution.

In an order dated April 30, 2004, I dismissed as unripe for review plaintiff's claims that the commission had erred in requiring plaintiff to provide its competitors with access to its digital subscriber line network architecture and the high frequency portion of its copper loop. In addition, I concluded that plaintiff and intervening defendants had failed to prove that they had standing on their remaining claims. I directed the parties to submit materials to the court showing whether the method that the commission had used had led to an increased rate (for intervening defendants) or a decreased rate (for plaintiff).

Now that the parties have shown they have standing to sue, I conclude that the court has jurisdiction to hear the case. In addition, I conclude that the Public Service Commission violated TDS's rights under the Telecommunications Act and the due process clause when it made determinations about the rates that plaintiff could charge without giving TDS an opportunity to respond to all of the evidence and argument presented by plaintiff. Accordingly, I will vacate the order at issue (the *UNE Compliance Order* ) and remand the case to give TDS and the other intervening defendants an opportunity to be heard.

## OPINION

### A. *Standing*

In response to the April 30 order, plaintiff and the intervening defendants have each submitted affidavits showing that the determinations they are challenging caused them economic harm. *See* Affs. of Michael Starkey, dkt. ## 81, 84; Aff. of Barbara Smith, dkt. # 86; Aff. of Dale Lundy, dkt. # 87, Aff. of Thomas Makarewicz, dkt. # 88. Although defendants do not dispute the evidence submitted by the other parties, they argue that the court should not consider the affidavits because they were not part of the record before the agency. In addition, defendants argue that plaintiff's affidavits "directly conflict" with the position plaintiff took before the Federal Communications Commission.

■ With respect to their first argument, defendants rely on *TCG Milwaukee, Inc. v. Public Service Commission of Wisconsin,* 980 F.Supp. 992, 998 (W.D.Wis. 1997), in which I noted, "Generally, review proceedings are confined to the record created in the administrative agency." It is not necessary to repudiate that statement in order to consider the parties' affidavits. Their purpose is not to demonstrate why the commission erred, but to comply with this court's order directing the parties to submit evidence showing that they had standing to challenge the commission's decision. On that issue, the record would be useless because the injury did not occur until the commission had issued its decision, which was after the administrative record was compiled. Allowing the parties to submit new materials on this issue does not evince a lack of deference to the commission or give plaintiff and·intervening defendants an unfair advantage. It simply allows the parties to show the existence of a case or controversy within the meaning of Article III.

Although defendants contend that plaintiff's affidavits conflict with its earlier position and for that reason should be ignored, they do not point to any *factual* discrepancies between the affidavits plaintiff filed in this court and those that it filed with the FCC in connection with an application to provide long distance service. Rather, defendants are restating the judicial estoppel argument that they made in their initial briefs, which is that plaintiff's current *legal* position (that the rates set by the Public Service Commission violate federal law) is inconsistent with its earlier representation to the FCC that these rates complied with § 271 of the 1996 Act. It is unnecessary to resolve·that question for the purpose of deciding whether plaintiff has standing to sue. Accordingly, because defendant has not disputed the evidence submitted by plaintiff and intervening defendants that shows that they suffered economic harm as a result of the commission's decisions, I conclude that the parties have established their standing to sue.

### B. *Subject Matter Jurisdiction*

Defendants argue in the alternative that even if plaintiff and intervening defendants have standing, this court still "lacks jurisdiction" to hear this case. Dfts.' Br., dkt. # 92, at 3, 8. They rely primarily on *AT&T Communications of Illinois v. Illinois Bell Telephone Co.,* 349 F.3d 402 (7th Cir.2003), in which the plaintiff brought a pre-enforcement challenge to an Illinois statute that established a method for determining the rates that the plaintiff could charge its competitors for use of its network. The plaintiff argued that the state's calculation of fill factors and depreciation was inconsistent with the "total element long-run incremental cost" (TELRIC), 47 C.F.R. §§ 51.505–515, under which the commission must "set prices based on the long-run costs that would be incurred to produce the services in question using the most efficient telecommunications technology now available, and the most efficient

network configuration." *AT&T,* 349 F.3d at 405. The district court agreed and invalidated the statute. In reviewing the district court's decision, the court of appeals stated that the plaintiff's failure to wait to file suit until the state commission had applied the statute had caused "unnecessary troubles":

Congress provided for federal judicial review of *rates* set by state commissions; it did not provide for review of individual factors that influence those rates. A lower fill factor, which elevates the rate, may be offset by other factors that depress it. As long as the final rate comports with TELRIC, why should it matter what role particular intermediate factors played? Any effort to analyze a factor in isolation poses a distinct risk of generating an advisory opinion, as well as a certainty of complicating review of the rate ultimately announced. A different way to put this is that review of agency action usually is limited to the agency's final decision, and the choice of one or two legal criteria that the agency will use along the way cannot be called a "final" decision. *See, e.g., FTC v. Standard Oil Co. of California,* 449 U.S. 232, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980). By the time the district court entered its injunction, the ICC had completed its work (the statute gave it only 30 days, after all); it would have been easy enough to wait that short time to ensure that the ICC's final decision was before the district court.

*Id.,* at 408–09.

■ The parties argue vigorously about the meaning of *AT&T* and the extent to which the court's concerns apply to this case. Defendants contend that *AT&T* stands for the principle that district courts are without jurisdiction to consider challenges to individual factors that influence rates. Plaintiff and intervening defendants assert two arguments in response;

they maintain that the *AT&T* language is dicta and that the concerns in that case are not present here because the parties are not bringing a pre-enforcement challenge.

None of the parties is completely correct. First, in *AT&T,* the court did not say anything about "lacking jurisdiction" to hear the case. Presumably, defendants are basing their argument on the court's statement that Congress "did not provide for review of individual factors" that influence rates. However, in light of *Verizon Maryland, Inc. v. Public Service Commission of Maryland,* 535 U.S. 635, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002), this statement cannot be interpreted as meaning that federal courts are *without subject matter jurisdiction* to consider those factors. In *Verizon,* 535 U.S. at 643, 122 S.Ct. 1753, the Court recognized that federal question jurisdiction under 28 U.S.C. § 1331 extends to any nonfrivolous claim that a state commission failed to comply with the Telecommunications Act and the rulings of the FCC. The Court held that § 252(e)(6) of the Act does not limit the application of § 1331. Thus, this court has subject matter jurisdiction to hear this case under § 1331.

## C. *Ripeness*

This does not mean, however, that *AT&T* is irrelevant to this case. The court was expressing at least two different concerns in its opinion. First, as plaintiff and intervening defendants argue, the court's reference to "advisory opinion[s]" and "final decision[s]" suggests that the court believed a challenge to a commission's method is not ripe for adjudication until after the rate has been set. *Id.* at 410 (characterizing problem as one of "prematurity"). As plaintiff points out, ripeness is not a problem in this case (at least with respect to its remaining claims) because the commission set rates in the *UNE Compliance Order.* (I note that many of the

rates set by the commission were only interim rates in effect until further factual findings were made. Although none of the parties suggests that the potentially temporary nature of the rates precludes this court from reviewing them, at least one court has held that a challenge to interim rates was not ripe for review. *US West Communications v. MFS Intelenet, Inc.*, 193 F.3d 1112, 1118–19 (9th Cir.1999). Because my decision with respect to TDS's due process claim requires a remand of the entire case to the commission, I need not determine whether plaintiff should have waited to bring this case until final rates were set.)

### D. *Scope of Review*

A second concern suggested by the court in *AT&T* is that neither the 1996 Act nor the FCC regulations require the commission to apply individual factors influencing a rate in a particular way. In other words, federal law is not violated so long as the final rate is "just" and "reasonable." This interpretation is supported by the court's later statement that "TELRIC [total element long-run incremental cost] requires that the *rate* reflect the costs of efficient production, not that each ingredient of the formula do so independently." *AT&T*, 349 F.3d at 411. This reservation about viewing factors in isolation would not be eliminated simply because a rate had already been set.

■ Plaintiff and intervening defendants advance several arguments why *AT&T* does not bar review of their claims. First, they point out that the court of appeals did not decline to review the plaintiff's challenge in that case just because plaintiff was challenging "factors" rather than "rates." Instead, the court concluded with this discussion:

> The district court's analysis may have been affected by the parties' choice to present for decision a challenge to two factors, standing alone, rather than a challenge to a promulgated rate. Both of these factors look to the present or the past; if they were the only factors, then the problem would be clear; but under TELRIC they can't be the only factors, and their propriety should not have been evaluated in isolation from the other components of a TELRIC rate.
>
> Which brings us to the problem: The state law, as the ICC understood and applied it, does require these factors to be used in isolation. The ICC took as set in stone all ingredients of ratemaking from 1997, and it adjusted the rate only by changing fill factors and asset lives. That approach conflicts with the 1996 Act and the TELRIC methodology and is therefore preempted. *See Wisconsin Bell, Inc. v. Bie*, 340 F.3d 441 (7th Cir.2003). Technology has changed since 1997; it cannot be that every rate-influencing consideration (other than fill factor and asset lives) has remained constant over the last six years. A rate for unbundled network elements generated by combining some factors that are six years out of date with two other factors that are not forward-looking cannot possibly satisfy the requirements of federal law.

*AT&T*, 349 F.3d at 411. Plaintiff argues that because the court of appeals went ahead and reviewed the commission's decision, any discussion the court of appeals included about when a decision could not be reviewed is dicta and therefore not binding on this court. Citing *Gillen v. City of Neenah*, 219 Wis.2d 806, 825 n. 11, 580 N.W.2d 628 (1998), defendants contend that the court of appeals' discussion is binding because it was "an important decisional point." Dfts.' Br., dkt. # 66, at 3. However, the Court of Appeals for the Seventh Circuit has held that any statements not essential to a court's holding are dicta and thus nonbinding. *E.g., Kling-*

*man v. Levinson*, 114 F.3d 620, 628 (7th Cir.1997). In interpreting federal law, I am bound by the Court of Appeals for the Seventh Circuit and not the Supreme Court of Wisconsin. Although I agree with plaintiff that the passage from *AT&T* on which defendants rely is not binding, it does not mean that the court's discussion may be disregarded. District courts should be guided by the views of the court of appeals or the Supreme Court, even when those views are expressed in dicta. *Reich v. Continental Casualty Co.*, 33 F.3d 754, 757 (7th Cir.1994).

■ *AT&T* makes it clear that courts should limit their review of a commission's decision to determining whether the rates set by the commission comply with TELRIC. But what does a rate that complies with TELRIC look like? Is it any rate using any method that results in a rate that would be similar to one using TELRIC method? Or is any rate that is calculated by a different method invalid per se? And if commissions must set rates in accordance with TELRIC methods to comply with federal law, how does a court determine whether the proper method was used? Does one improperly calculated factor impermissibly taint the result or must a carrier show that *all* the factors are wrong or something else?

Defendants suggest that only the result matters and that it makes no difference how a commission applies individual factors if the final rate is reasonable. For support, they rely on *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 109 S.Ct. 609, 102 L.Ed.2d 646 (1989), in which a utility company challenged rates set by the state commission as constituting a taking without just compensation in violation of the Fifth Amendment. In arguing that the rates were unconstitutional, the plaintiff criticized various aspects of the commission's method. However, the Court concluded that "'the Commission was not bound to the use of any single formula or combination of formulae in determining rates.'" *Id.* at 619–20 (quoting *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 602, 64 S.Ct. 281, 88 L.Ed. 333 (1944)). Rather, the only relevant question in determining whether there was a violation of the takings clause was whether the final rate was so unjust as to be confiscatory. "The Constitution protects the utility from the net effect of the rate order on its property. Inconsistencies in one aspect of the methodology have no constitutional effect on the utility's property if they are compensated by countervailing factors in some other aspect." *Id.* at 619, 64 S.Ct. 281.

Of course, a challenge to rates under the takings clause is not the same as a challenge to rates under the Telecommunications Act of 1996. Unlike the Constitution, the Act and the FCC's orders and regulations *do* "bind" commissions to employ a particular method. *Verizon*, 535 U.S. at 494, 122 S.Ct. 1646; *see also U.S. West Communications, Inc. v. MFS Intelenet, Inc.*, 35 F.Supp.2d 1221, 1236 (D.Or.1998) (declining to follow *Duquesne* in context of Telecommunications Act because of special requirements imposed by Act). The court of appeals recognized this difference implicitly in *AT&T*, 349 F.3d 402. In that case, the court did not know the rates set by the state commission because the plaintiff had brought the suit before the commission issued its decision. Thus, the court had no way of knowing whether the final rate would be the same as a rate set using TELRIC principles or even similar to such a rate. Nevertheless, the court invalidated the state statute because the state's *method* conflicted with federal requirements. *Id.* at 411 (commission's "approach conflicts with the 1996 Act and the TELRIC methodology and is therefore preempted"). If the court had followed *Duquesne*, it could not have ruled as it did. As the Supreme Court emphasized in *Veri-*

*zon,* 535 U.S. at 524, 122 S.Ct. 1646, the general rule is that a court may not rule on whether a particular method leads to an unconstitutional rate until the rate has actually been set.

Plaintiff's second analogy is closer to the point. Under 47 U.S.C. § 271, an incumbent may not offer long distance telephone service in its own state until the Federal Communications Commission has granted the incumbent permission to do so. Section 271 lists a number of prerequisites that incumbents must satisfy, including compliance with § 252(d)(1), which sets forth the requirements for rates that incumbents may charge competitors. In reviewing applications, the FCC has interpreted § 271 as mandating compliance with the FCC's TELRIC method. *IN THE MATTER OF APPLICATION BY BELL ATLANTIC NEW YORK,* 1999 WL 1243135, 15 F.C.C.R. 3953, ¶ 237 (1999).

■ It is generally a state commission and not the carriers themselves that set the rates that the FCC reviews. *E.g., WorldCom, Inc. v. FCC,* 308 F.3d 1 (D.C.Cir.2002); *AT&T Corp. v. FCC,* 220 F.3d 607 (D.C.Cir.2000). The FCC has declined to upset a commission's determinations even if "isolated factual findings by a commission might be different from what [the FCC] might have found." *Bell Atlantic,* 1999 WL 1243135, 15 F.C.C.R. at ¶ 244. Instead, the FCC will reject an application only if "basic TELRIC principles are violated or the state commission makes clear errors in factual findings on matters so substantial that the end result falls outside the range that the reasonable application of TELRIC principles would produce." *Id.*

■ An incumbent or competitor that loses before the FCC may challenge the decision in federal court. The Court of Appeals for the District of Columbia Circuit has articulated the following standard of review in such a case:

a challenger can prevail here by making one of two showings. First, he may demonstrate that the FCC acted arbitrarily and capriciously in finding that the state commission followed basic TELRIC principles. Alternatively, he may point to specific factual errors made by the state commission, and demonstrate either that the FCC failed to consider these errors or that it arbitrarily determined that the rates were nevertheless within the range acceptable under TELRIC.

*Sprint Communications Co. L.P. v. F.C.C.,* 274 F.3d 549, 557 (D.C.Cir.2001).

Both plaintiff and intervening defendants object to the use of proceedings under § 271 as a model for review in this case, which was brought pursuant to § 252(e)(6). They point out that under § 271, the FCC has only 90 days to accept or reject an application and as a result, its review of the state court's determinations is necessarily limited.

Although it is true that the FCC does not conduct a de novo review of state commission rate determinations, neither do federal courts, at least with respect to determining whether a state commission has applied TELRIC correctly. As suggested in *Sprint Communications,* judicial review of TELRIC determinations is governed by an arbitrary and capricious standard. Although *Sprint Communications* involved a challenge under § 271, the court provided three reasons for giving deference to the FCC's decision that were unrelated to the short period in which the FCC was required to make its ruling: (1) "the issues at stake [are] ones involving a high level of technical expertise in an area of rapidly changing technological and competitive circumstances"; (2) "the Commission itself was reviewing a state agency with considerable expertise"; and (3) "enormous flexibility [is] built into TEL-

RIC." *Id.* at 556 (internal quotations omitted). Each of these reasons for deference applies to this case as well.

■ However, plaintiff is correct that when the FCC and the courts have reviewed the FCC's decisions under § 271, they have considered individual factors in reviewing rates. Thus, the question is not whether carriers can challenge individual factors that influence a rate but whether they can show that an error in the calculation of one factor or multiple factors was so substantial that it made the commission's determination arbitrary and capricious. I agree with plaintiff and intervening defendants that a court cannot give meaningful review to a rate without looking at the factors that affect the rate. I agree also that requiring carriers to show how *each* factor was calculated is unduly burdensome and not required by the statute. If carriers can show mistakes serious enough to make a rate arbitrary and capricious on their own, the carriers should not have to demonstrate that those mistakes were not offset by other mistakes. If the *commission* wants to defend a particular calculation by arguing that it purposely understated (or overstated) a particular factor because it believed that another factor was overstated (or understated), it may do so, but the commission should not be able to insulate itself from judicial review by making review an impossible task.

### E. *Due Process*

Yet another "jurisdictional" question must be resolved before I reach the merits. One of the challenges raised by intervening defendant TDS in its counterclaim is that it did not receive due process before the commission made its determinations with respect to the operating support system test costs, the integrated digital loop carrier (IDLC) conversion charges and the Alcatel digital loop carrier (DLC) system discount. (In the April 30, 2004 order, I stated that both MCI and TDS were asserting a claim that the commission failed to provide them with due process before deciding to include operating support system testing costs in the joint and common costs. However, in its brief on standing, MCI states that its sole challenge is to the commission's decision to include operating support systems costs.) However, at the time TDS filed its cross claim, the administrator to whom the commission had delegated these decisions had not yet *made* any decisions. (None of the parties challenge the commission's authority to delegate these issues, so I do not consider that issue.) After TDS filed its counterclaim, the administrator held an evidentiary hearing. TDS does not argue that it was unable to give testimony, cross-examine witnesses or present oral arguments at the hearing. Instead, it argues that it did not receive the process it was due under the Constitution or the Telecommunications Act because even at the hearing, it was precluded from presenting evidence or argument (1) of DLC discounts earned after March 22, 2002; (2) that OSS testing costs should not be part of the joint and common costs; and (3) that it should not have to pay plaintiff's IDLC conversion charges. (TDS was unaware that these matters were in issue until plaintiff filed its reply brief, after TDS had had its opportunity to comment.)

Defendants ask the court not to reach the merits of TDS's challenge for several reasons: (1) the claim is not ripe; (2) TDS is not challenging a final agency action; (3) abstention is proper because the state proceedings are ongoing; and (4) TDS has not exhausted its administrative remedies. In addition, plaintiff argues that events occurring since TDS filed its complaint have mooted TDS's due process claims. With respect to the ripeness question, an initial question is the temporal limits of the analysis. Is it the state of affairs at the time

of filing the complaint that determines whether a dispute is ripe for review or may a court consider later events? In this case, a hearing was held after TDS filed its complaint. In addition, defendants have informed the court in their brief on standing that on May 27, 2004, the administrator issued his decision on the three issues delegated to him. In that decision, the administrator determined that he would not adjust the amount of OSS testing costs used in the joint and common costs markup and that the monthly recurring rate for ILDC conversions should be $0.16 for each unbundled loop. However, the administrator deferred his determination of the appropriate discount again to allow plaintiff to adjust its cost studies.

If ripeness is viewed as a question of subject matter jurisdiction, subsequent events would be irrelevant because jurisdiction depends on facts as they exist at the time the complaint is filed. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 571 n. 4, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). However, the Supreme Court has indicated that "the ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Reno v. Catholic Social Services, Inc.*, 509 U.S. 43, 57 n. 18, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993); *see also Blanchette v. Connecticut General Insurance Corp.*, 419 U.S. 102, 138, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974) (ripeness doctrine is concerned both with existence of a "case or controversy" under Article III and "judicial restraint").

One of the leading treatises on federal practice states without citation to authority that "[t]he court will review the issue of ripeness as of the time the litigation is commenced." 15 *Moore's Federal Practice*, § 101.74 (3d ed.2004). What little case law exists on the subject is not as clear. In a number of cases, the Court of Appeals for the Seventh Circuit appears to have assumed without discussion that the time of filing controls. *E.g., Commodity Trend Service, Inc. v. Commodity Futures Trading Commission*, 233 F.3d 981, 986 (7th Cir.2000) (concluding that case was ripe because plaintiff "had a reasonable fear of being subject to administrative proceedings at the time [it] filed its complaint"); *G. Heileman Brewing Co. v. Anheuser–Busch, Inc.*, 873 F.2d 985, 991 (7th Cir.1989) ("We believe these facts confirm that Miller's interest at the time the complaint was filed was not merely speculative."). However, the court of appeals has noted also that sometimes "prematurely filed suits" may be "retained on the docket until it is time to proceed," suggesting that a court may look at later events in deciding whether a case is ripe. None of the parties address this issue, but they all appear to assume that the time of filing controls, so I will do the same.

■ Plaintiff and defendants argue that TDS's due process claim is not ripe because at the time TDS filed its complaint, neither the administrator nor the commission had determined the prices that TDS is challenging. Although plaintiff and defendants are correct that final rates had not been set at the time TDS filed its cross claim, it does not follow necessarily that TDS's claim is not ripe. The Supreme Court has held repeatedly that " '[o]ne does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough.' " *Blanchette v. Connecticut General Ins. Corporations*, 419 U.S. 102, 143, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974) (quoting *Pennsylvania v. West Virginia*, 262 U.S. 553, 43 S.Ct. 658, 67 L.Ed. 1117 (1923)); *see also New York v. United States*, 505 U.S. 144, 175, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) (finding pre-enforcement challenge to statute ripe when there was no dispute that statute would

later have adverse impact on plaintiff). TDS is arguing that both the OSS testing costs and the ILDC conversion charges should be set at *zero.* Neither plaintiff nor defendants suggest that there is any possibility that the commission will accept this position given the commission's previous rulings. As the administrator has pointed out, the *UNE Compliance Order* contemplated that plaintiff would be permitted to recover these costs from its competitors. *UNE Compliance Order,* dkt. # 24, at 5 ("It is reasonable to allow the addition of operational support system (OSS) testing costs to the joint and common mark-up in the Network Support category."); *id.* at 6 ("It is reasonable to delegate the determination of average historical costs of IDLC conversions to the Division Administrator using the Category 3 process with no interim rate.") The only question left unresolved was what the costs would be. Thus, whatever rate the commission would ultimately adopt, it would cause TDS an injury. Accordingly, I conclude that these two claims are ripe.

 The same cannot be said of TDS's claim about the discount it is entitled to receive on the digital loop carrier electronics. Plaintiff has suggested a 6% discount; TDS argues that the discount should be 13%. Neither the commission nor the administrator has decided yet whether to accept TDS's proposal. (Even in the May 27, 2004 order, the administrator deferred the decision on the appropriate discount until plaintiff had adjusted its cost study.) Further, TDS has failed to explain in any of its briefs why it believes that it is a forgone conclusion that it will be harmed by the final result. TDS writes only that because it was unable to argue that evidence from after March 2002 was relevant, it was unable to "presen[t] its best case regarding the discount level." TDS's Br., dkt. # 83, at 9. This is insufficient. At a minimum, TDS must demonstrate that injury is likely to occur because of the al-

leged due process violation. "A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States,* 523 U.S. 296, 300, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998) (quoting *Thomas v. Union Carbide Agricultural Products Co.,* 473 U.S. 568, 581, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985)). Because TDS has failed to explain how its failure to present additional evidence makes it highly probable that the commission will adopt a higher rate, this claim will be dismissed as unripe.

 Defendants' and plaintiff's remaining procedural arguments are not persuasive. Defendants point to no law requiring TDS to exhaust its administrative remedies. The cases they cite, *McNeil v. United States,* 508 U.S. 106, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993), and *Perez v. Wisconsin Department of Corrections,* 182 F.3d 532 (7th Cir.1999), both involved statutes that required litigants to exhaust their administrative remedies before bringing a lawsuit in federal court. Defendants point to no corresponding provision in the Telecommunications Act. Further, defendants do not even articulate what administrative process TDS would have left to exhaust. Although the proceedings before the commission have not yet concluded, TDS is not able to pursue its *due process* claims in the state forum. The administrator and the commission are considering only what the appropriate rates are, not whether TDS received fair process. Thus, TDS's claim is not barred for failure to exhaust its administrative remedies.

Next, defendants argue that TDS's procedural claims are not reviewable because there has been no "final order." Defendants cite *Lujan,* 497 U.S. at 882, 110 S.Ct. 3177, and *Bell v. New Jersey,* 461 U.S. 773, 778, 103 S.Ct. 2187, 76 L.Ed.2d 312 (1983), in which the Supreme Court imposed this

requirement in cases arising under the Elementary and Secondary Education Act and the Administrative Procedure Act. (Defendants cite a number of state court decisions as well, but these would not control a case brought under federal law.) However, as TDS points out, neither *Lujan* nor *Bell* involved a challenge under the Telecommunications Act. TDS points to *AT & T Communications Systems v. Pacific Bell,* 203 F.3d 1183 (9th Cir.2000), in which the court held that the "final agency action" requirement of the APA does not apply to cases brought under the Telecommunications Act because that act allows review of any "determination" by a state commission and not just "final" determinations. 47 U.S.C. § 252(e)(6).

*Pacific Bell* is the only case any of the parties cite that involved the Telecommunications Act. I need not decide whether to follow that case because I conclude that even if the "final order" requirement does apply to this case, the *UNE Compliance Order* satisfies it with respect to TDS's procedural claims. The Supreme Court has held that agency action is final if it is "the consummation of the agency's decision making process" and "rights or obligations have been determined" by the action or "legal consequences will flow" from it. *Bennett v. Spear,* 520 U.S. 154, 178, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). The commission made it clear in the *UNE Compliance Order* that TDS would not have an opportunity to challenge the commission's conclusions that the rates plaintiff could charge its competitors would include the OSS testing costs and the ILDC conversion charges. There was nothing the administrator could do to change this result, as the administrator himself later confirmed. Further, TDS moved the commission to reconsider its decision and the commission denied the motion before TDS filed its counterclaim in this court. Thus, there was nothing tentative about the commission's decision.

It was sufficiently final to allow review in this court.

With respect to defendants' argument that this court should abstain under *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), defendants have failed to cite any cases in which a court abstained in circumstances similar to this case. One of the criteria for *Younger* abstention is that the litigant must have an adequate opportunity to raise the federal question in the context of the state proceedings. *Ohio Civil Rights Commission v. Dayton Christian Schools, Inc.,* 477 U.S. 619, 627, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986). In their brief, defendants appear to concede that TDS has no way of raising its procedural challenges before the commission. However, they argue that this court should abstain nevertheless because TDS's claim "can be adequately evaluated by this court at the conclusion of the administrative proceedings." Dfts.' Br., dkt # 66, at 19–20. This is a simply a rehash of their ripeness, finality and exhaustion arguments, which I have rejected.

Finally, Plaintiff argues that TDS's procedural claims are moot because TDS received a hearing after it filed its cross claim in this court. Plaintiff views TDS's claim too narrowly. The claim was not just that the commission failed to provide a hearing, but that TDS was not permitted *in any way* to rebut plaintiff's evidence and argument that the rates should include OSS testing costs and IDLC conversion charges. The hearing provided by the administrator did not remedy this problem, but only confirmed it, so the hearing does not moot TDS's claim. Accordingly, I conclude that I may consider TDS's procedural claims on the merits.

Turning to the merits of the claim, it will be useful to explain part of the process that the commission followed before it issued the *UNE Compliance Order.*

In the *Final Decision*, the commission directed plaintiff to file cost studies by May 10, 2002, in accordance with the method set forth in the decision. After plaintiff filed its cost studies, the commission gave TDS and the other competitors an opportunity to comment on plaintiff's submissions and to file their own cost studies. On September 10, 2002, plaintiff filed a reply to the competitors' response and included for the first time IDLC conversion charges and OSS testing costs in its cost studies. The commission did not give TDS and the other competitors an opportunity to respond to the new information submitted by plaintiff. In the *UNE Compliance Order*, the commission concluded that plaintiff could include the IDLC conversion costs and the OSS testing costs in the rates that it charged the competitors for access to plaintiff's network.

TDS contends that the process it received before the commission was deficient under both the Telecommunications Act and the due process clause. With respect to its statutory claim, TDS points out that 47 U.S.C. § 252 imposes certain procedural requirements on the arbitration of agreements, including an opportunity to respond to the other side's position. 47 U.S.C. § 252(b)(3). With respect to its constitutional claim, TDS argues that it has a property interest in the rates set by the commission. *Wisconsin Bell, Inc. v. Bie*, 216 F.Supp.2d 873 (W.D.Wis.2002); *MCI Telecommunications v. BellSouth Telecommunications*, 9 F.Supp.2d 766, 772 (E.D.Ky.1998). Thus, TDS contends that the due process clause required the commission to provide TDS with an opportunity to respond to plaintiff's evidence and arguments relating to IDLC conversion charges and the OSS testing costs before the commission determined that those costs would be included in the final rates.

I conclude that either under § 252 or the due process clause, TDS is entitled to present evidence and argument supporting its position. (In its brief, plaintiff questions whether the procedural requirements of § 252 applied to the commission's determinations. However, it does not develop this argument so it is waived.) Neither plaintiff nor defendants deny that TDS has had *no* opportunity to rebut plaintiff's position that OSS testing costs and IDLC conversion charges should be included as part of the rates that plaintiff could charge its competitors. Further, no party denies that TDS has a property interest in rates set by the commission or that TDS had a right to respond to plaintiff's evidence before the commission made its decision. *E.g., Brock v. Roadway Express, Inc.*, 481 U.S. 252, 264, 107 S.Ct. 1740, 95 L.Ed.2d 239 (1987) (in administrative proceeding, due process required allowing party suffering loss to see other side's evidence against him and opportunity to rebut that evidence). Instead, plaintiff and defendants argue only that TDS was afforded a hearing after it filed its cross claim. Again, however, this argument overlooks the fact that the hearing did nothing to remedy the commission's failure to consider evidence or argument from TDS and the other competitors before determining that the OSS testing costs and IDLC conversion charges would be included in the rates. Accordingly, I conclude that the *UNE Compliance Order* must be vacated so that TDS and the other intervening defendants may have an opportunity to be heard on these questions.

Because I am remanding the case to the commission to reconsider its decisions regarding the OSS testing costs and the IDLC charges, I will dismiss plaintiff's and intervening defendants' remaining claims. The IDLC conversion charges are applicable to all loop rates. *UNE Compliance Order*, dkt.# 24, at 59. The OSS testing costs affect *all* the rates because they are part of the joint and common costs. 47

C.F.R. § 505(c)(1); *Implementation of the Local Competition Provisions in the Tele-communications Act of 1996,* First Report and Order, 11 FCC Rcd. 15499, ¶ 646. Thus, reconsideration of these issues could affect the other parties' claims. Any ruling on the appropriate application of other factors would be premature until the commission has made a new decision.

## ORDER

IT IS ORDERED that

1. The Public Service Commission's *UNE Compliance Order,* Docket 6720–TI–61 (July 9, 2003) is VACATED with respect to the commission's determinations that the operational support system testing costs and the integrated digital loop carrier conversion costs may be included in the rates that plaintiff SBC Wisconsin may charge its competitors for access to its network.

2. The case is REMANDED to the commission to allow intervening defendants AT & T Communications of Wisconsin, TDS Metrocom and MCI to present evidence and argument that these costs should not be included in the rates.

3. The remaining claims of plaintiff and intervening defendants are DISMISSED. If the parties object to the commission's determinations after it has reconsidered its decision, they are free to file a new action.

4. The clerk of court is directed to close this case.